THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BENNIE MILLER, Defendant-Appellant.

(No. 59941;

First District (1st Division)—July 21, 1975.

438

James J. Doherty, Public Defender, of Chicago (Dorothea Kaplan, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Raymond J. Prosser, and Marcia B. Orr, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE SIMON delivered the opinion of the court:

Murder is always tragic, and the circumstances which give rise to this appeal are especially so. They involve an unfortunate victim, Johnny H. Travis, shot down in front of his wife on South State Street near 47th Street in Chicago by a stranger to the couple. The shooting occurred while Mr. and Mrs. Travis were walking to her sister's wedding reception, and Mr. Travis died 4 days later. The tragedy is heightened by the age of the assailant—13 years. He was convicted by a jury of the murder and attempt armed robbery, and sentenced to confinement for a term of 20 to 40 years.

A hearing was held in the juvenile division of the circuit court on October 25, 1972, pursuant to section 2—7(3) of the Juvenile Court Act (Ill. Rev. Stat. 1971, ch. 37, § 702—7(3)), on a motion of the State's Attorney to transfer the defendant to adult criminal jurisdiction. The court entered an order of "no objection to transfer." The defendant was indicted on November 29, 1972, by the extended October 1972 grand jury. His trial took place in 1973 after he had reached the age of 14.

The statute under which the transfer hearing was held was amended effective January 1, 1973, to provide for a mandatory hearing at which the juvenile division of the court is required to find that it is not in the best interests of a minor or the public to proceed under the Juvenile Court Act[1] before prosecution of the minor may take place under the criminal laws. (Ill. Rev. Stat. 1973, ch. 37, § 702—7(3).) The Act as amended sets forth the matters the court shall consider in reaching its determination.[2] At the time of defendant's hearing in 1972, the statute then in effect provided for a hearing in instances where the State's Attorney determined that a minor should be prosecuted in criminal proceedings and the juvenile court judge objected, but did not specify the matters to be considered. Although the record shows no objection by the juvenile court judge, the hearing referred to above was nevertheless held. The defendant was represented by court-appointed counsel. A motion by the defendant to dismiss the transfer petition was denied. A police officer called by the State testified about information furnished to him by the victim's wife who witnessed the homicide and the defendant's juvenile record was introduced. The defendant offered no evidence, but his attorney argued against the transfer.

The defendant relying on *Kent v. United States* (1966), 383 U. S. 541, contends that he did not receive the type of hearing in the juvenile division contemplated by that decision, and accordingly was denied due process of law. Similar contentions have been considered by the Illinois Supreme Court which distinguished the District of Columbia statute involved in *Kent* from the Illinois statute in effect in 1972 and concluded that neither due process requirements, nor the Illinois statute mandated such a hearing in this jurisdiction: *People v. Sprinkle* (1974), 56 Ill.2d 257, 307 N.E.2d 161; *People v. Reese* (1973), 54 Ill.2d 51, 294 N.E.2d 288; *People v. Hawkins* (1972), 53 Ill.2d 181, 290 N.E.2d 231; *People v. Handley* (1972), 51 Ill.2d 229, 282 N.E.2d 131; *People v. Bombacino* (1972), 51 Ill.2d 17, 280 N.E.2d 697. The rationale of these decisions is that the Illinois statute vests the prosecutor rather than the court with

---

[1] Ill. Rev. Stat. 1973, ch. 37, § 701—1 *et seq.*
[2] Ill. Rev. Stat. 1973, ch. 37, § 702—7(3)(a).

the authority to determine whether to proceed against a juvenile as an adult while the District of Columbia statute places responsibility for that determination in the juvenile court. They also hold that it was constitutionally valid for the Illinois legislature to give the State's Attorney rather than the judiciary the authority to make that determination.

■■ *People v. Rahn* (1974), 59 Ill.2d 302, 319 N.E.2d 787, in concluding that a minor could not be indicted by the State's Attorney without the concurrence of the juvenile court judge, held that the legislative intent in enacting the statute in effect in 1972, was that the ultimate determination with respect to transfer of a minor for criminal prosecution was to be a judicial one. To that extent it may be inconsistent with the above cases, but it is not applicable to the procedure followed with respect to this defendant because judicial consent to the transfer was given after the hearing described above rather than in isolation as in *Kent*. That hearing followed the outline for a proper hearing set forth in *Kent* except that the record does not contain a statement by the court of the reasons for the transfer. The differences between the Illinois statute in effect in 1972 and that involved in *Kent* and the four Illinois Supreme Court decisions distinguishing *Kent* lead to the conclusion that this omission does not require remand to the juvenile division for an additional hearing.

■■ The defendant also contends that because the amendment to section 2—7 of the Juvenile Court Act referred to above became effective prior to his trial, although after his transfer and indictment, he should have been transferred back to the juvenile division for a new hearing under the amended statute. The answer to defendant's argument is found in section 4 of the statutory construction act (Ill. Rev. Stat. 1973, ch. 131, § 4), which limits the applicability of any new law to its effective date and provides that a new law shall not be construed to repeal or affect any right accrued under the former law or before the new law takes effect. The additional provision of that statute that proceedings after the new law takes effect "shall conform, so far as practicable, to the laws in force at the time of such proceeding" did not require an additional hearing since the proceeding in the juvenile division took place prior to the effective date of the new law. Nor does *People v. Hollins* (1972), 51 Ill.2d 68, 280 N.E.2d 710, on which the defendant relies, indicate that a second hearing in the juvenile division should have taken place in 1973; it deals with an amended sentencing code and is predicated upon the portion of section 4 (Ill. Rev. Stat. 1973, ch. 131 § 4) which excepts sentencing provisions from other types of statutes, thus permitting a defendant to elect not to be sentenced under the law in effect at the time of the offense if the new law provides a lesser penalty. There is no justification for re-

troactive application of the January 1, 1973, amendment to the statute governing transfer of juveniles to criminal court jurisdiction.

■■ The defendant next argues that his indictment in November by the October 1972 grand jury, which had been extended to continue to function in November 1972, was improper. His position is that a grand jury when extended into a succeeding month has authority to consider only matters presented to it during the month in which it was impaneled and that defendant's indictment was not one of such matters. *People ex rel. Carey v. Power* (1975), 59 Ill.2d 569, 322 N.E.2d 476, held the portion of Rule .06(a) of the circuit court of Cook County which permitted the court to extend the term of any grand jury *for the purpose of completing any matters then under consideration or investigation* by the grand jury invalid insofar as it attempted to limit matters which an extended grand jury might consider. The effect of that decision is to leave an extended grand jury free to inquire into matters not previously considered by it, and the defendant's attorney conceded this at oral argument.

Defendant also contends the State failed to prove that he had the capacity at the time of the crime to distinguish good from evil, understand the nature and consequences of his conduct and appreciate that his conduct was wrong and, therefore, the State failed to discharge the burden of proof beyond a reasonable doubt. Prior to 1962, the Illinois statute provided for a presumption of incapacity to be applied to children under 14;[3] and also provided that no child under 10 should be found guilty of any crime or misdemeanor.[4] The presumption of incapacity, therefore, applied prior to 1962 to those who were 10 or older but younger than 14. The current statutes relating to criminal responsibility effective since January 1, 1962, contain no provision providing for a presumption of incapacity with respect to minors or reference to the ages of 10 and 14, but provide, instead, that no person below the age of 13 at the time he commits an offense shall be convicted.[5] Article 6 of the current statutes which deals with matters of criminal responsibility and capacity as affected by infancy, mental disorder and intoxication contains no definition of "sound mind" comparable to the statute (ch. 38, § 590) as it

[3] Ill. Rev. Stat. 1961, ch. 38, § 590, repealed by Ill. Rev. Stat. 1973, ch. 38, § 35—1, effective January 1, 1962, provided as follows:
     "A person shall be considered of sound mind who is neither an idiot nor a lunatic; nor affected with insanity, *and who hath arrived at the age of fourteen years, or before that age if such person knows the distinction between good and evil.*" (Emphasis added.)

[4] Ill. Rev. Stat. 1961, ch. 38, § 591, repealed by Ill. Rev. Stat. 1973, ch. 38, § 35—I, effective January 1, 1962.

[5] Ill. Rev. Stat. 1973, ch. 38, § 6—1.

existed prior to January 1, 1962. However, section 6—2(a) of the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, § 6—2(a)) provides:

> "A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law."

■■ The defendant's theory is that a rebuttable presumption of incapacity existed in the common law for those who were 13 years of age, and therefore the current statutes on criminal responsibility must be construed as continuing that common law presumption unless there is a clear and specific showing that the intention of the legislature was to eliminate it. Combining this with the rule that penal statutes as well as statutes in derogation of the common law are to be strictly construed and such construction is to favor the accused, the defendant argues that the current statutes failed to specifically provide that the presumption of incapacity was eliminated for those who were 13 years of age, and, since the current statutes permit their conviction, it continues for those of that age.

■■ Evidence of an intent to eliminate the common-law presumption is found within the current statutes which fix the only relevant age for conviction at 13 or older, dispense with the prior statutory reference to criminal capacity of an infant and set forth the circumstances applicable to those 13 years of age or over which relieve a person of criminal responsibility for his conduct. The committee comments section 6—1 of the Criminal Code (Ill. Ann. Stat. ch. 38, § 6—1 (Smith-Hurd 1972)) demonstrate that the 1962 statute was intended to eliminate the common law presumption of incapacity and replace it with a presumption of capacity for all persons who reach the age of 13.[6] It is proper to look to the committee comments to ascertain the purpose of a statute and its proper application. (*People v. Plewka* (1975), 27 Ill.App.3d 553, 558-59, 327 N.E.2d 457.) It was, therefore, unnecessary for the State to affirmatively prove defendant's criminal capacity at his trial; also, it was not error for the trial court to refuse the defendant's tendered instructions regarding proof of criminal capacity.

Additional objections raised by the defendant require an examination of factual matters relating to his arrest and trial.

---

[6] A portion of the Committee Comments states:

> "In approaching the redraft of these provisions the Committee sought to accomplish two purposes: first, the raising of the minimum age of criminal capacity; second, the elimination of the presumption of incapacity thereby withholding from the jury an unsatisfactory and uncongenial task."

The victim and his wife were walking north on the east side of South State Street between 47th Street and 46th Street at about 9 p.m. on October 14, 1972, when a boy walked up to them and asked the victim whether he wanted to buy some records. The couple turned around and Mr. Travis told the boy he had no money. As Mr. and Mrs. Travis commenced to walk off another boy walked up to them, and when standing in front of them announced a stickup, told them to stand still and not move and said he had a gun pointing at them. Mrs. Travis testified the boy had a "bitty" gun which "looked like a .25," that it was black and the boy was pointing it at her husband and at her, who were then standing close together. Mrs. Travis in her testimony identified the boy as wearing a brown rust hat with buckles around it, a blue shirt and blue-and-white striped pants and with a tan trench coat over his shoulder.

Mr. Travis told the boy with the gun he had no money and started to walk away when the boy shot him from a distance of approximately 2 feet. Mrs. Travis observed the boy run west across State Street through a playground toward Federal Street.

Officer Borowski arrived at the scene of the shooting a few minutes after it occurred. He testified that Mrs. Travis described the boy who fired the shot to him mentioning that he was wearing a brown rust-color hat with buckles and carrying a tan coat, and described the other boy as wearing dark clothing. The boy who fired the shot was described as a young boy between 13 and 14. Mrs. Travis pointed Officer Borowski in the direction in which the assailant fled. Officer Borowski and his partner next proceeded in their squad car in the direction indicated by Mrs. Travis and within a brief period and a short distance they noticed the defendant who answered the description Mrs. Travis had given them and who was wearing a rust-colored hat with buckles and carrying a tan trenchcoat. Officer Borowski, upon getting out of his squad car, observed what appeared to be the outline of a small caliber weapon in the defendant's pocket and then placed the defendant under arrest. Later that night, Mrs. Travis identified defendant in a police lineup.

Officer Reid, who was also at the scene of the shooting, testified at the hearing on a motion to suppress that the victim and Mrs. Travis gave him a description of the assailant, but he was not certain which of them gave him the description. His testimony about the description he received was that the boy who fired the gun was wearing an orange or rust hat with a wide brim, an orange-and-black sweater shirt and striped blue jeans. His written report described the hat as an orange sailor-type hat, the sweater as orange plus a blue jacket and blue jeans.

■■ Defendant argues that his arrest and the search of his pocket which produced the gun were improper. If Officer Borowski had reasonable

grounds to believe the boy he arrested had committed an offense, he was authorized to arrest him without a warrant and make a warrantless search of the boy's clothing. The test is whether a reasonable and prudent man having the knowledge of the arresting officer at the time, in the light of the facts and circumstances, would have believed that the person he was about to arrest had committed an offense. (*People v. Bambulas* (1969), 42 Ill.2d 419, 247 N.E.2d 873; *People v. Wright* (1968), 41 Ill.2d 170, 242 N.E.2d 180.) Evidence seized as a result of a search after a lawful arrest, if otherwise competent and relevant, is admissible against the person arrested. *Chimel v. California* (1969), 395 U.S. 752; *People v. Doss* (1970), 44 Ill.2d 541, 256 N.E.2d 753.

■■ Officer Borowski was provided with a detailed description of the assailant immediately after the shooting. Following the path Mrs. Travis told him the boy took in running away, he came upon defendant wearing clothing matching Mrs. Travis' description to him, and with what appeared to be a gun in his pocket. Under these circumstances, the officer could reasonably come to the conclusion he was in the presence of the boy who shot Mr. Travis, and the arrest and subsequent search of the defendant did not violate fourth amendment rights.

Defendant also urges that the conflict between the description Mrs. Travis gave Officer Borowski and the one she gave Officer Reid and which he recorded in his report demonstrates she was so confused that reasonable grounds to arrest based on her description could not have existed. The significant description is the one Officer Borowski testified he received and on which he acted. He was already on his way to his encounter with the defendant while Mrs. Travis was talking with Officer Reid, so nothing she told Officer Reid affected Officer Borowski's judgment in arresting the defendant, and the detailed findings entered by the trial judge in denying the motion to suppress show that the court did not consider anything other than what Officer Borowski testified he had been told.

■■ The defendant next contends that the evidence failed to prove his guilt beyond a reasonable doubt because of discrepancies in descriptions Mrs. Travis gave the police of his clothing as well as discrepancies in statements she made concerning the side of her husband on which she was standing when the shooting took place, the direction of defendant's flight, and the conduct of the lineup. The inconsistencies in Mrs. Travis' testimony and statements to police officers concerned trivial details and are not unusual when a witness is asked at different times about many details observed or related under stress. The consistent elements in the description of the defendant by Mrs. Travis render any discrepancies meaningless. The defendant matched the description Officer Borowski

testified Mrs. Travis gave him as well as her own testimony. Mrs. Travis was able to identify the defendant at the lineup, and there was proof that the gun found on the defendant was the murder weapon. Conflicts in testimony, including the credibility to be given to alibi witnesses who placed the defendant in a different location at or about the time of the shooting,[7] are to be resolved by the trier of fact. Minor inconsistencies in the testimony and statements of the occurrence witness do not, in view of the strong evidence of guilt, justify reversal. *People v. Bell* (1972), 53 Ill.2d 122, 290 N.E.2d 214; *People v. Clay* (1963), 27 Ill.2d 27, 187 N.E. 2d 719.

■■ The court instructed the jury that it was the judge of the credibility of the witnesses and the weight to be given to their testimony, and that in considering their testimony the jury could take into account the memory of each witness, his manner while testifying and any interest, bias or prejudice he may have had. Because of the insignificance of the inconsistencies in Mrs. Travis' testimony, this instruction was sufficient to assist the jury in appraising her credibility; the court properly refused an instruction to the effect that statements made by a witness inconsistent with his testimony may be considered by the jurors in deciding the weight to be given to the testimony. The discrepancies in Mrs. Travis' statements or testimony were not significant enough to require an instruction of the type that was refused.

■■ The defendant contends that the testimony of the State's ballistics expert failed to establish the essential link between the bullet removed from the victim's body and the gun in defendant's possession when he was arrested. The expert was a police sergeant. He testified that the evidence bullet and two other bullets test-fired from the weapon all had identical class characteristics of six lines[8] and grooves twisting to the right, as well as identical individual markings caused by imperfections in the weapon's barrel. The witness' testimony did not include a description of the individual markings and the defendant contends that without such testimony the jury was unable to make an adequate comparison of the evidence bullet and the test bullets. The testimony of the State's expert, however, appears to have been as complete as that of the ballistics expert in *People v. O'Neal* (1969), 118 Ill.App.2d 116, 254 N.E.2d 559, in which

---

[7] The jury was not obligated to believe the alibi witnesses over Mrs. Travis' positive identification of the defendant even though there was more than one alibi witness. *People v. Jackson* (1973), 54 Ill.2d 143, 295 N.E.2d 462; *People v. Clark* (1972), 52 Ill.2d 374, 387, 288 N.E.2d 363; *People v. Catlett* (1971), 48 Ill.2d 56, 64, 268 N.E.2d 378; *People v. Smith* (1974), 21 Ill.App.3d 366, 374, 316 N.E.2d 170.

[8] The record reflects that the witness used the word "lines." This was probably a typographical error and the word used was probably "lands."

the expert's opinion was held to be properly admitted even though there was no factual basis in the evidence to support his conclusion that two test bullets had been fired by the same gun as the evidence bullets because neither the test bullets, photomicrographs or an explanation of the particular similarities was offered in evidence. Here the test bullets were offered in evidence and although the expert did not describe the details of the individual markings caused by imperfections in the gun's barrel, he did describe the class characteristics. The defendant attempts to distinguish *O'Neal* because in that case the defendant acknowledged the expertise of the ballistics witness, while in this case the defendant objected to the ballistics testimony on the ground that the witness had not been established to be an expert. However, the court concluded that he was an expert and his credentials support that conclusion. The testimony of the ballistics expert witness was properly admitted in evidence, and it was for the jury to determine the weight his testimony should be given. *People v. O'Neal* (1969), 118 Ill.App.2d 116, 123, 254 N.E.2d 559.

The defendant also argues that the testimony of a pathologist with respect to cause of death was hearsay because the witness supervised another doctor who performed an autopsy on Mr. Travis and he was, therefore, incompetent to testify as to cause of death. The failure of defendant's trial counsel to object to any portion of the pathologist's testimony waives the issue of review. (*People v. Howell* (1975), 60 Ill.2d 117, 324 N.E.2d 403; *People v. Riles* (1973), 10 Ill.App.3d 772, 295 N.E.2d 234.) Indeed, defense counsel fully participated in cross-examining the pathologist and eliciting information from him before the jury. In any event, objection to the pathologist's testimony would have been to no avail since he was testifying to observations that he himself made. He was present at the autopsy; he saw Mr. Travis' body; he personally studied the bullet entry wound; he personally examined the internal organs; and, he personally noted the path of the bullet inside the body. The pathologist's testimony was properly introduced because he personally observed the autopsy and was able to form an opinion as to cause of death from personal observation.

The defendant also complains that the autopsy report was hearsay because it was based in part on information furnished by telephone by the authorities at the hospital where Mr. Travis was treated and died. The autopsy report was neither introduced in evidence, nor referred to by the pathologist to refresh his recollection. The only reference to the autopsy report occurred during cross-examination when the pathologist was asked if it was his opinion that Mr. Travis' left kidney and adrenal glands were removed by the surgeon who treated him after he was shot and the response was that this information was given to him by the

surgeon and incorporated in the autopsy report. The accuracy of the information provided by the surgeon was not questioned by the defendant at the trial, and there is no showing that this prejudiced the defendant. Moreover, a pathologist who may require, in performing an autopsy, information as to the extent of surgery previously performed on the deceased is not disqualified from giving his opinion as to cause of death because he did not witness the surgery.

■■ The defendant claims that the hearing in aggravation and mitigation was improperly conducted because the court in imposing sentence considered the defendant's juvenile record including proceedings which did not result in a finding of delinquency. The record does not show that the trial judge relied on any part of the defendant's juvenile record in imposing sentence. Defendant's dedicated counsel in pleading for leniency informed the court that the defendant had several sisters and brothers and that his mother had told counsel none of them had ever been in trouble and that her sons who were over 20 did not even know the defendant had been involved in any difficulties with the law. At that point, the trial judge interrupted to ask whether the mother had told her 20-year-old sons about juvenile proceedings in which the defendant was involved in 1971. This is not the equivalent of referring to encounters with the authorities in determining the sentence to be imposed, and there is no basis in the record to assume that because the trial judge referred to the defendant's juvenile record in his colloquy with counsel, he also considered any of his prior difficulties in imposing sentence.

■■ Finally, it appears from the record that the defendant fired upon Mr. Travis to keep him from moving away from the scene of the attempt of defendant and his accomplice to rob their victim. There is nothing in the speedy culmination of the tragedy ending in Mr. Travis' death to indicate that the attempt armed robbery was ended and a murder was embarked upon. It was all part of the same course of conduct and the conviction for the offense of attempt armed robbery should be vacated. *People v. Hickman* (1973), 56 Ill.2d 175, 306 N.E.2d 32; *People v. Prim* (1972), 53 Ill.2d 62, 289 N.E.2d 601.

Affirmed in part; reversed and vacated in part.

GOLDBERG and EGAN, JJ., concur.